**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

JASON SMITH, and JONATHAN SANTANA,

        Plaintiffs,

v.                                                                      Case No.

FALCO PICTURES, LLC, and ARTISTS
EQUITY, LLC,

        Defendants.

_____/

## VERIFIED COMPLAINT

Plaintiffs, JASON SMITH, and JONATHAN SANTANA, (collectively, "Plaintiffs"), hereby sue Defendants, FALCO PICTURES, LLC, and ARTISTS EQUITY, LLC (collectively, "**Defendants**"). In support hereof, Plaintiffs state as follows:

## INTRODUCTION

Nationwide, recruiting individuals willing to join law enforcement has become increasingly difficult, and one significant contributing factor is the way police officers are portrayed in television and film. Hollywood has long-shaped public perceptions of policing, often prioritizing dramatic storytelling over true representation of being in law enforcement.

While earlier movies and shows tended to depict "hero cops," more recent movies and shows have shifted toward critical portrayals that emphasize corruption, brutality, or law enforcements' institutional flaws. These frequent negative depictions—especially when reinforced by a movie that starts by saying "inspired by true events" — is what sells, but it erodes public trust and legitimacy of the street cops that protect us day in and day out.

This Lawsuit arises from Defendants' production and distribution of the motion picture "The Rip" ("the Film"), which is presented as 'inspired by true events' while incorporating

distinctive elements of a real law-enforcement investigation conducted by Plaintiffs and portraying those associated with that investigation as engaging in criminal misconduct.

Apart from the fact that a large seizure occurred, the events portrayed in the Film did not happen. Although the Film uses fictionalized names, it unmistakably identifies the Miami-Dade Police Department, (now the Miami Dade Sheriff's Office or MDSO), the Miami Lakes/Hialeah location, the drug-money seizure found in orange buckets hidden in the walls, and a specific investigative team unique to the Miami-Dade Police Department.

Since September 2025, with the release and widespread dissemination of the trailer and promotional materials for *The Rip*, along with the release of the Film, third parties have approached Plaintiffs asking which character they were and how many buckets they kept.

For months, these promotional displays were strategically placed at high-traffic venues reaching millions of people, leaving the public with an impression of corruption and theft by featuring copy such as: "If you found $20 million, how much would you RIP?" in connection with marketing materials touted as inspired by a locally famous, internationally recognized case.

Family members and colleagues have also remarked that Plaintiffs must have used seized funds to complete personal property improvements, purchase vehicles and vessels, and afford private schooling for their children.

These reactions, and those local political leaders that have come out publicly against this film, demonstrate that viewers are associating the Miami-Dade Police Department and Plaintiffs with the corrupt portrayals in *The Rip*.

### PARTIES

1.  Plaintiff, JASON SMITH ("Smith"), is a resident of Miami-Dade County, Florida.

2.  Plaintiff, JONATHAN SANTANA ("Santana"), is a resident of Miami-Dade

2

County, Florida.

3.      Defendant, ARTISTS EQUITY, LLC, is a California limited liability company having its principal place of business in Los Angeles, California, and founded by the main stars of the movie *The Rip*, that being Matt Damon and Ben Affleck. Damon and Affleck also produced the Film at Artists Equity.

4.      Defendant, FALCO PICTURES, LLC is a Delaware limited liability company having its principal place of business in Los Angeles, California, and served as a production company for the movie *The Rip*, which was produced in association with Artists Equity.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1332(a)(1) and 1332(c)(1) because there is complete diversity of citizenship between Plaintiffs and the Defendants, and the amount in controversy exceeds $75,000 exclusive of interest and costs.

6.      Venue is proper in the United States District Court for the Southern District of Florida under 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiffs' cause of action occurred in this District; the tortious acts complained of herein occurred, were made, and/or were published in this District; and Defendants filmed portions of the movie in the Port of Miami, participated in ride-alongs with Miami-Dade police personnel as part of the film production, and based the defamatory portrayal on an incident, persons, and events centered in the City of Hialeah, Florida, and the Miami-Dade Police Department, which is located within this District.

7.      All conditions precedent to bringing this action have occurred, been satisfied, waived, or excused.

## GENERAL ALLEGATIONS

8. Defendants produced the movie *The Rip*, and distributed the movie through Netflix to the public as a film "inspired by true events" while depicting fabricated criminal misconduct within the Miami-Dade Police Department's Narcotics Bureau.

9. *The Rip* is portrayed as a true story of Police Captain Christopher Casiano of the Miami-Dade Police Department, and tells the story of a group of police officers who, during a raid on a hidden cash operation, find their trust broken down as team members suspect each other of trying to steal a large sum of cash.

10. Not only was Capt. Christopher Casiano never involved in the real incident the Film used as the inspiration for the story, Casiano was not even part of the Narcotics Bureau of the Miami-Dade Police Department when the real incident occurred, did not execute the search warrant, and was not present for the recovery of the concealed currency and contraband.

11. Official records of the June 29, 2016 investigation, including the search warrant return and related reports, identify Plaintiffs as the supervising and lead investigating officers and do not identify Capt. Christopher Casiano as involved in the investigation.

12. Upon information and belief, Capt. Christopher Casiano was compensated in connection with providing information used as the basis for the Film.

13. In connection with the promotion of the Film, individuals associated with the Film, including its writer/developer, Joe Carnahan, and actors such as Matt Damon and Ben Affleck, participated in interviews, podcasts, and other public media appearances in which the underlying events depicted in the Film were attributed to Christopher Casiano and his investigation.

14. Artists Equity, LLC and Falco Pictures, LLC, and affiliated entities, also engaged law enforcement consultants in connection with the development and production of the Film.

15. The motion picture *The Rip* was directed by Joe Carnahan, who, upon information

4

and belief, was involved in the development, production, and promotion of the Film.

16.    The Film replicates distinctive and verifiable elements of the June 29, 2016 seizure conducted by the Miami-Dade Police Department, which was supervised by Plaintiff Sergeant Jason Smith (portrayed by actor Matt Damon) and executed by Detective Jonathan Santana (portrayed by actor Ben Afflek).

17.    In public interviews, the actors, including Matt Damon and Ben Affleck, emphasized their efforts to prepare for their roles with authenticity and respect.

18.    These statements reflect that the actors undertook research to understand the underlying events, including the roles of the supervising sergeant and the lead investigating detective.

### The Real June 29, 2016, Investigation and Seizure

19.    On June 29, 2016, the Miami-Dade Sheriff's Office (at the time known as Miami-Dade Police Department) Narcotics Bureau executed a search warrant on a home located in Miami Lakes, a city bordering Hialeah in Miami-Dade County.

20.    At the time of that investigation, Detective Jonathan Santana was the lead detective assigned to the case, drafted the search warrant affidavit, initiated and effected the arrest affidavit, and participated directly in the investigative actions that led to the discovery of the concealed currency and contraband.

21.    Sergeant Jason Smith was the supervisory sergeant who assigned the narcotics investigation, supervised the investigative team, and served as the on-scene supervisor during execution of the search warrant and seizure of the currency.

22.    A consent to search of the residence was obtained as part of an investigation into a man known as Luis Hernandez-Gonzalez, the owner of a gardening supply store that was allegedly

being used as part of a marijuana trafficking operation.

23.     During the consent to search of the residence, a large amount of United States Currency was located in plain view in the master closet belonging to Luis Gonzalez-Hernandez. At which point, a search warrant for the residence was obtained.

24.     A currency detection canine was brought into the residence and gave a positive alert for the odor of currency.

25.     An arched nook containing a statue concealed the false wall.

26.     Upon entering the attic of the home, the team discovered an orange bucket with bundles of $100 bills and a loaded TEC-9 pistol.

27.     A garden rake was found, and when it was moved, it revealed a false wall as the drywall gave way, exposing a hidden room filled with orange buckets.

28.     The officers had to use sledgehammers in order to break through the drywall and pull out the buckets.

29.     The money was properly secured and transported under escort by the Special Response Team to the Miami-Dade Police Department Property and Evidence Section.

30.     Approximately two days later, after three counts conducted by Plaintiffs, the total recorded amount reached $21,970,411.00 in currency seized, the largest cash seizure in the history of the Miami-Dade Police Department.

### The Film's Replication of Distinctive True Facts

31.     The Film reproduces specific details of that June 29, 2016, investigation, including:

    a)     The location of the "rip" being in Miami-Dade County;

    b)     The recovery of over $20 million by the Miami-Dade Police Department;

    c)     The presence of a cash sniffing dog alerting as to the presence of money;

6

> d)   The presence of an arched nook with a statue on the false wall;
>
> e)   Orange buckets concealed within a residential wall;
>
> f)   The physical breach of the drywall to expose those buckets;
>
> g)   Currency packaged in cellophane with marked denominations; and
>
> h)   Recovery of a loaded Tech 9 firearm at the scene located in one of the buckets.

32.   The Film also places those details in the Miami and Hialeah setting and places them within a Miami-Dade Police Department narcotics context consistent with Plaintiffs' investigation, specifically the Miami-Dade Police Department narcotics team supervised by Sergeant Jason Smith and led by Detective Jonathan Santana.

33.   *The Rip* opens by presenting a Miami-Dade Police Department narcotics team as the focus of the story and by framing the narrative as one grounded in true or truth-inspired events.

34.   In the Film, Defendants depict members of the narcotics team as coming under suspicion for participating in so-called "inside heist teams," namely police officers who rob drug stash houses and steal drug proceeds for their own benefit.

35.   From the outset, Miami-Dade Police Officers are presented not as ordinary law-enforcement personnel carrying out legitimate duties, but as potential participants in organized criminal conduct under color of law.

**The Film's Portrayals and Fabricated Events**

36.   Defendants begin the Film with the murder of Captain Jackie Velez, a member of the MDPD narcotics team, during a nighttime shooting.

37.   After Jackie Velez's murder, the Film portrays the remaining five members of the team as being questioned and scrutinized by Federal Agents who suspect that her killing may be

tied to corruption within the team itself.

38. The Film thereafter centers on Lieutenant Dane Dumars, played by Matt Damon (Damon), and Detective Sergeant J.D. Byrne, played by Ben Affleck (Affleck), as principal members of the narcotics team.

39. Damon assigns the narcotics investigation, supervises the investigative team, and serves as the on-scene supervisor during the search of the premises and seizure of the currency.

40. Affleck serves as the lead detective assigned to the case, reports to Damon, obtains the "consent to search" the premises, and participates directly in the investigative actions that lead to the discovery of the concealed currency and contraband.

41. Following the scene involving the Federal Investigation, the Film depicts Damon receiving information from an unknown caller concerning a stash house located in Hialeah, Florida.

42. Directly after receiving the tip, Damon goes outside and tells the team: "It's money up in a house in Hialeah. I wanna rip it. Don't wanna end the week on a goose egg."

43. The team was outside of the Police Department drinking, smoking and playing dominos, while someone in the parking lot was doing doughnuts in a vehicle.

44. The Film then emphasizes financial pressure within the team, and officers immediately ask whether the operation will qualify for overtime to which Damon responds that it will not, stating: "No. This is extra credit."

45. The Film then depicts one officer objecting that, without overtime, the officers are being denied the ability to pay their bills, stating: "So they get to just fucking pay their bills, and we don't get to fucking pay our bills?" In doing so, the Film expressly links the officers' participation in the operation to personal financial need.

46.     The Film then depicts Damon telling different officers different amounts supposedly located at the house.

47.     When asked how much money was in the house, Matt Damon's character responds, "250 maybe," prompting another officer to reply, "Oh, shit. All right, bet. That's an easy rip. Friday night?"

48.     Damon then gives a different figure to another officer, stating the operation is supposed to be "150K." Damon gives inconsistent information to members of the team before the operation begins.

49.     When asked whether local Hialeah police should be involved, Damon responds: "Absolutely not. That entire department's upside down." The scene thereby presents the operation as one the officers intend to carry out without involving the local jurisdiction and outside ordinary law-enforcement channels.

50.     Following these exchanges, the team is then depicted as arriving at the supposed stash house, shortly after they had been drinking alcohol.

51.     The sequence then shows the team obtaining consent to enter the home through deception and lies.

52.     Affleck asks the supervising officer, "All right, what do we tell 'em?" to which Damon responds: "A lie."

53.     Rather than entering on the basis of a transparent money seizure, the officers concoct a plan to enter the home by using a narcotics pretext with Damon instructing the officers to obtain consent to search "for dope instead of money."

54.     When Affleck asks what happens if the occupant does not sign the consent form because the house actually contains narcotics, Damon responds: "Well, then it's a protective

search. We clear the place anyway."

55.     The Film next shows the officers arriving at the residence in Hialeah with Wilbur, the money-detection dog.

56.     Before any lawful basis for entry is established, Wilbur reacts intensely outside the home.

57.     In that scene, one officer remarks that he has never seen the dog alert in that manner and states that the dog appears to be going "crazy" while peeing on the walls of the house.

58.     When the officer asks how much money is being held inside, Damon responds: "75 grand" an amount which again contradicts previous statements to his subordinate officers.

59.     Affleck and Damon then make contact with the female occupant of the residence at the door of her home and identify themselves as Miami police officers.

60.     After the occupant asks why the officers are at her home, Damon states that they received a "Crime stopper tip" indicating there may be narcotics on the premises, and Affleck adds that such tips are "typically pretty reliable" and therefore must be followed up.

61.     When the occupant asks whether the officers have a warrant, Damon responds that they instead have a "consent to search," and when the occupant notes that she can refuse and asks "what would you say to that?" Damon responds "Well, you would have to say no first" while a money detection dog is aggressively barking in the background.

62.     The officers continue pressuring the occupant to sign the consent form and Affleck tells her: "Sign the paper and we'll be in and out. We want to go home, too."

63.     The Film further depicts the occupant objecting to what she describes as "pushy cop" behavior.

64.     Affleck responds by telling her that the other officers are the ones she does not want

to "fuck with."

65. Upon obtaining "consent," the officers push forward with the operation while the occupant protests their conduct.

66. The officers proceed through the residence and into the attic, where they encounter a nook with a small statue mounted in it.

67. After pulling a cable sticking out from a wall socket, a compartment opens directly behind the statue.

68. The officers break down the wall and uncover a hidden compartment behind the wall in the attic, where they discover more than $20 million in cash stored in orange buckets along with a TEC-9 pistol.

69. Immediately after that discovery, Affleck orders the other officers downstairs and begins collecting their phones.

70. When Affleck asks Damon how much money had been indicated by the tip, Damon gives yet another number, telling him the amount is "300 grand."

71. Damon then refuses to notify the Major of the full amount of money found in the house and instead states that he is not "risking it" by calling the Major because he and Affleck do not trust the police command structure.

72. Suddenly, one of the officers notices a police vehicle outside approaching the house.

73. In this ominous scene, the vehicle is seen approaching in the darkness and the officers driving asks the narcotics officers why they "didn't get a heads up about this."

74. Damon responds that the reason they were not notified is that they belong to the Hialeah Police Department and could not be trusted to keep a secret.

75. After the discovery of the money, the Film depicts the officers remaining inside the

residence and around the cash rather than immediately contacting command regarding the full seizure.

76.     Two officers while counting the money then begin to contemplate the salaries they earn per year for all the work they do and comparing it to what they have seized, with one noting that, "Just this. This little money right here… would make my life so much easier to live."

77.     The officers counting money in this scene further converse stating whether "the cartel would throw me a little loan, . . . you know, cover my nut?" to which the other responds "It don't hurt to ask, you know? I heard they're pretty cool about loaning money to cops."

78.     The Film then shows Damon addressing the other officers directly and stating: "But just between us… I think we can make something happen here. All right? I know we're all thinking it, so let's get realistic right now. But I wanna get mine, and I know you wanna get yours. All right? I wanna get paid."

79.     In that same sequence, the officers begin counting the cash inside the residence after Damon states that they will "finish the count," while the full amount remains undisclosed to command.

80.     As the officers remain at the house with the cash, the Film depicts gunfire erupting in the surrounding residential neighborhood, placing the officers under attack while they continue attempting to move and control the money.

81.     After leaving the house to investigate the gunfire, Damon and Affleck later speak directly with cartel members, who tell them that none of their members had anything to do with the attack, that they have no interest in the money discovered in the house, and that they do not want more dead police officers because the captain who had already been killed had hurt their business enough.

82. In that same exchange, Damon and Affleck ask whether the cartel had anything to do with the murder of Captain Velez, and the cartel representative ends the encounter by telling them, "Good luck, Detectives. You will need a lot of it tonight."

83. Back at the residence, while the officers are loading bags of money, disputes arise among the officers about who is in charge and what is being done with the cash, and one officer states, "So that's it? You're gonna burn us, boss? That's it? You're just gonna take the fucking money?"

84. At the same time, the residence catches fire, and the Film depicts the house burning while the officers continue trying to remove bags of money from the scene, with the occupant of the house exclaiming, "And what about my grandmother's house? It's burning."

85. After the money is taken from the house, the Film depicts the officers loading it into and leaving the scene in a DEA official's waiting vehicle that is parked outside the residence and driving away with him.

86. At this point, the Film ties those events back to the earlier murder of Captain Jackie Velez, with officers accusing one another during the transport of having "pulled the trigger" and having "finished her."

87. In the latter portion of the Film, it is revealed that certain law-enforcement personnel connected to the operation- one of the MDPD officers and a DEA agent- were themselves involved in theft and in the murder of Captain Velez.

88. The Film further depicts that, after the DEA agent responsible for the murder is confronted, he is shot and killed by Affleck at the scene rather than being taken into custody and arrested.

89. During this scene, the DEA agent is shown as being wounded and kneeling on the

floor.

90.     Affleck, rather than immediately arresting the DEA agent, begins to converse with the DEA agent who had murdered Captain Velez.

91.     The scene then depicts what appears to be a hand moving, followed by Affleck shooting the DEA agent in the head.

92.     The shooting scene itself includes flashbacks between Affleck firing the pistol and Captain Velez's murder.

93.     All of this suspicion, accusation, and violence culminate in the Film revealing that Damon and Affleck were working to uncover the members of the team and Federal Agency involved in the theft scheme.

### Publication, Identification, and Aftermath

94.     The Film's use of unique, non-generic details of the June 29, 2016 investigation, combined with its Miami-Dade setting and portrayal of a narcotics team, creates a reasonable inference that the officers depicted are Plaintiffs.

95.     Since the release and publication of the Film, and the dissemination of its trailer, Plaintiffs have repeatedly been questioned by third parties regarding the characters and events depicted. These interactions demonstrate that individuals have associated Plaintiffs with the individuals portrayed in the Film.

96.     After the release of the trailer, a Miami-Dade County State Attorney contacted a Plaintiff to ask whether any allegations of theft had ever been made in connection with the case, and further stated that his office would be looking into it. This demonstrates that an individual in an official capacity, directly connected to both the case and the county, associated the Film with the Plaintiffs.

97. Third parties have asked Plaintiffs which characters in the Film they were and how many buckets they kept.

98. Family members, colleagues and peers in other entities unknown to the Plaintiffs but aware of the 2016 case, also remarked that Plaintiffs must have used seized funds to build personal property improvements, purchase vehicles and vessels, and afford private schooling for their children.

99. Another Miami-Dade County State Attorney phoned a Plaintiff to ask if he had any financial gain from the movie released and also stated "I can't believe you killed another cop." This, once again, demonstrates that an individual in an official capacity, directly connected to both the case and the county, associated the Film with the Plaintiffs.

100. These reactions occurred because the Trailer and Film are based on and reproduce specific details of the June 29, 2016, investigation supervised by Plaintiff Sergeant Jason Smith and executed by Plaintiff Detective Jonathan Santana.

101. The Film also places those details in Miami and Hialeah and ties them to a Miami-Dade Police Department Narcotics team, such that viewers familiar with the underlying events can identify Plaintiffs and the members of their team as the officers portrayed in the Trailer and Film.

102. A listed actor, who also served as a consultant for the Film and is a Miami-Dade Police Department officer familiar with the case, was present in the property room on the day of the seizure and knew which individuals were properly responsible for the operation.

103. Following the Film's release, he contacted the Plaintiffs on behalf of Joe Carnahan, to apologize for Christopher Casiano's representation of the story and offered to "make it right" by proposing potential roles and consulting opportunities in a subsequent film.

104. This communication reflects that individuals involved in the Film's development

were aware of the identities of the officers involved in the underlying investigation.

105.    Moreover, the Mayor of Hialeah came out and spoke in protest of the Film's release and portrayal of the City of Hialeah and its law enforcement personnel.

**The Plaintiffs' Demands for Retraction and Correction**

106.    On or about December 23, 2025, Plaintiff, Sergeant Jason Smith, through counsel, sent Defendants a demand letter regarding the defamatory statements and depictions in *The Rip's* trailer release and other promotional material.

107.    The letter specifically identified which false statements and depictions of fact and false implications were knowingly and recklessly conveyed by Netflix through the dissemination of *The Rip's* trailer release and its related publications.

108.    It further demanded that Defendants cease and desist from releasing or otherwise disseminating the motion picture, and that Defendants preserve any evidence regarding the creation of the Film.

109.    Defendants responded on or about January 20, 2026, after the release of the Film, stating Plaintiffs' concerns are unfounded because the Film did not expressly name Sergeant Smith and there was no implication that the Plaintiffs engaged in any misconduct in the Film.

110.    On or about March 5, 2026, Plaintiffs, Sergeant Jason Smith and Sergeant Jonathan Santana, through new counsel, sent Defendants a second formal demand for correction and/or retraction of the false portrayals contained in the Film, demand letter attached as Exhibit "A".

111.    In that demand letter, Plaintiffs advised Defendants that the June 29, 2016 seizure that serves as the factual foundation for the Film was conducted under the supervision of Sergeant Jason Smith and executed by Detective Jonathan Santana of the Miami-Dade Police Department.

112.    In that same demand letter, Plaintiffs advised Defendants that the Film replicated

distinctive and verifiable elements of that real investigation.

113. Plaintiffs further advised Defendants in the demand letter that the Film depicted identifiable members of their investigative team as engaging in fabricated criminal conduct.

114. Plaintiffs demanded a public retraction and correction, the addition of a prominent disclaimer to the Film and promotional materials, monetary compensation, cessation of further distribution of the Film absent corrective measures, and a preservation and insurance notice, including notice that Defendants' conduct was interfering with Plaintiffs' ability to pursue documentary and media opportunities based on the true events of the investigation.

115. Defendants have refused to comply with Plaintiffs' demands, response attached as Exhibit "B".

116. The Defendants based their refusal on the fact that the Film includes a disclaimer in the end credit.

117. Defendants also stated that none of the members of the team in the Film have names matching real people, the Film's raid took place in Hialeah instead of Miami Lakes, the house in the Film belongs to a woman instead of a man, and the Film's plotlines regarding corrupt law enforcement and a murdered police captain are fictional.

118. The Defendants also noted that in the Film Damon was only "pretending to contemplate stealing the money in the stash house as a ruse to discover which member of his team was involved in the murder of Capt. Jackie Velez."

119. Defendants further alleged that the scene involving the killing of the DEA agent was an "obvious" act in self-defense.

120. Defendants have continued distributing and promoting the Film in its current form notwithstanding Plaintiffs' demand for correction and retraction.

17

121.     The Film continues to display, at its outset (approximately 36 seconds into the Film), the statement 'inspired by true events' in large block letters.

122.     The Film includes the following disclaimer only after the conclusion of the Film and its credits: 'This program is inspired by real events; however, the characters and events depicted have been fictionalized for dramatic purposes, and any similarity to actual persons is purely coincidental and unintentional.' By contrast, the representation that the Film is 'inspired by true events' appears prominently at the outset.

123.     The placement and presentation of the disclaimer are insufficient to negate the Film's earlier factual framing.

124.     As a result of this Film and the identification of Plaintiffs with the officers depicted in the Film, the harm to Plaintiffs has continued.

### Resulting Damage to Plaintiffs

125.     As a direct result of Defendants' publication, distribution, and promotion of *The Rip* and its related marketing materials, Plaintiffs have suffered substantial harm to their personal and professional reputations.

126.     The Film and its promotional content imply misconduct, poor judgment, and unethical behavior in connection with a real law-enforcement operation.

127.     Defendants used distinctive details from the June 29, 2016 Miami Lakes seizure, including cash hidden in orange buckets inside a wall, the method of discovery, the presence of a nook with a statute inside the residence, currency packaged in a distinctive manner and a loaded TEC-9 pistol. Those details allowed people familiar with the case to connect Plaintiffs to the Film's fictional portrayal.

128.     After the Film's release and promotion, Plaintiffs were approached, questioned, and

confronted by individuals who linked them to the conduct depicted in the Film.

129.   These interactions included insinuations that Plaintiffs participated in, approved of, or were associated with unlawful conduct.

130.   As a result, Plaintiffs have suffered damage to their reputations, diminished standing among peers and colleagues, and injury to their credibility in law-enforcement and professional circles.

131.   Plaintiffs have also suffered economic harm, including lost income, reduced earning capacity, and lost professional opportunities.

132.   The Plaintiffs' professional value depends in substantial part on their credibility, integrity, and recognized experience in narcotics investigations and major seizure cases.

133.   Plaintiffs have also suffered emotional distress; they have experienced anxiety, frustration, humiliation, embarrassment, and mental anguish from repeated questions and assumptions about their conduct and integrity.

134.   Defendants' conduct has caused Plaintiffs ongoing stress in defending their reputations. It has also strained personal and family relationships and created an emotional burden that continues as long as the Film remains available and promoted.

135.   Defendants' conduct has interfered with Plaintiffs' ability to pursue future opportunities that would otherwise have been available to them. Plaintiffs have specialized knowledge and experience that would qualify them for consulting, advisory, training, and speaking roles.

136.   The harm to Plaintiffs has been further exacerbated by post-release promotional activities in which the underlying investigation has been publicly attributed to individuals other than Plaintiffs, including through interviews, podcasts, and media appearances by Defendants and

individuals associated with the Film.

137.   As a result, Plaintiffs have not only been associated with the Film's false portrayals, but have also been deprived of proper recognition for their roles in the actual investigation.

138.   Because of the confusion caused by the Film, Plaintiffs' credibility as accurate sources of the underlying events has been undermined. Opportunities have been diverted to others, and Plaintiffs' ability to benefit from their own professional experience has been materially reduced.

139.   Plaintiffs further had the ability and intent to participate in and/or develop a documentary or other media project based on the true events of the June 29, 2016 investigation.

140.   Defendants' publication and promotion of the Film, and the resulting public confusion as to the facts of the investigation and the identities of those involved, have materially impaired Plaintiffs' ability to pursue such opportunities and to present themselves as credible sources of the underlying events.

141.   As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered actual damages, including reputational harm, professional harm, emotional distress, lost income, diminished earning capacity, and loss of future opportunities, in amounts to be determined at trial.

## COUNT I
## DEFAMATION PER SE

142.   Plaintiffs reallege and incorporate by reference paragraphs 1 through 141 above, as if fully set forth herein.

143.   This is an action against Defendants for defamation *per se*.

144.   At all times material hereto, Defendants were each aware that Plaintiffs had engaged in a lawful investigation and seizure on June 29, 2016, and that Plaintiff Sergeant Jason Smith supervised that investigation and Plaintiff Detective Jonathan Santana executed and

participated in the investigative actions that led to the discovery of the concealed currency and contraband.

145.    Nevertheless, Defendants jointly and intentionally produced, published, distributed, marketed, and promoted The Rip as a film "inspired by true events," while using distinctive and verifiable details from that real investigation and portraying identifiable members of Plaintiffs' narcotics team as corrupt, criminal, and professionally unethical.

146.    *The Rip* was made of and concerning the Plaintiffs and their 2016 investigation and seizure and depicts Plaintiff Sergeant Jason Smith, portrayed by actor Matt Damon, and Detective Jonathan Santana, portrayed by actor Ben Afflek.

147.    Although Plaintiffs are not named in the Film, *The Rip* as a whole contains sufficient facts or references from which the Plaintiffs may be determined by the persons watching or who have watched the Film.

148.    The Film replicates the roles that both Sergeant Jason Smith and Detective Jonathan Santana performed in the 2016 investigation and seizure.

149.    The average person could reasonably conclude that the Film implicates the Plaintiffs upon watching the Film.

150.    Moreover, those who know the Plaintiffs can make out that that they are the persons referred to in the Film.

151.    Family members, colleagues, peers, and other third parties, including a state attorney, have identified the Plaintiffs as those depicted in the Film and made comments regarding this to the Plaintiffs

152.    In the Film, Defendants state and depict, in substance, that members of the Miami-Dade Police Department Narcotics team tied to the real June 29, 2016, seizure:

1.      Contemplated and intended to steal seized drug proceeds for personal gain;

2.      Performed police operations without involving the local jurisdiction and outside ordinary law-enforcement channels;

3.      underreported the amount of money reported in a crime stopper tip and concealed the true amount from command;

4.      collected phones, withheld information from superiors, and remained at the residence with the cash in furtherance of a theft scheme;

5.      communicated directly with cartel members outside ordinary law-enforcement channels;

6.      Constantly disregarded the chain of authority in the police department, including the structure within their own team;

7.      participated in or were connected to arson in a residential neighborhood while removing money from the scene;

8.      were involved in the murder of Captain Jackie Velez and in concealing wrongdoing within the team; and

9.      shot and killed a Federal Agent instead of arresting him.

153.    Defendants published the foregoing statements and depictions as "inspired by true events" without any credible basis or proof that Plaintiffs had engaged in theft, underreporting of seized funds, concealment of evidence, coordination with cartel members, arson, murder, or other criminal misconduct.

154.    Below are the time stamps of the scenes from the Film whereby Defendants caused the above-described statements and depictions to be made.

### *The Rip* Film Scenes

155.    At approximately timestamp 00:03:21, the Film depicts the Plaintiffs' narcotics team being questioned and scrutinized by Federal Agents who suspect that the killing of a former member of the team was tied to corruption within the team itself.

156.    At approximately timestamp 00:16:00, the Film depicts the members of the Plaintiffs' narcotics team drinking, smoking, and playing dominoes directly outside of the Police Department.

157.    At approximately timestamp 00:16:10, the Film depicts the members of the Plaintiffs' narcotics team objecting to conducting an operation based on lack of overtime and stating that: "So they get to just fucking pay their bills, and we don't get to fucking pay our bills?"

158.     At approximately timestamp 00:16:40, the Film depicts the supervising officer lying to various members of the team as to the amount of the "Rip" and giving them inconsistent information.

159.    At approximately timestamp 00:17:00, the Film depicts supervising officer stating when asked whether local Hialeah police should be involved: "Absolutely not. That entire department's upside down."

160.    At approximately timestamp 00:18:30, the Film depicts the officers obtaining consent to enter a home through deception, lies, and coercion, including having a conversation in which one member asks the supervising officer, "All right, what do we tell 'em?" to which the supervising officer responds: "A lie."

161.    At approximately timestamp 00:30:20, the Film depicts the supervising officer refusing to notify his superior as to the full amount of money discovered at the house.

162.    At approximately timestamp 00:32:30, the Film depicts the officers questioning the integrity of the Hialeah Police Department.

163.    At approximately timestamp 00:45:00, the Film depicts the officers asking hypothetically whether the cartel would loan them part of the seized money.

164.    At approximately timestamp 00:49:00, the Film depicts the supervising officer addressing the other officers directly and stating: "But just between us… I think we can make something happen here. All right? I know we're all thinking it, so let's get realistic right now. But I wanna get mine, and I know you wanna get yours. All right? I wanna get paid."

165.    At approximately timestamp 01:03:00, the Film also depicts the officers speaking directly with cartel members and disclaims any possibility that the cartel had any involvement with the police killing.

166.    At approximately timestamp 01:05:30, the Film depicts the members of the team arguing over who is in charge and what was to be done with the cash, with one officer questioning the supervising officer's intentions and stating, "So that's it? You're gonna burn us, boss? That's it? You're just gonna take the fucking money?"

167.    At approximately timestamp 01:11:00, the Film further depicts the residence catching fire while officers continue attempting to remove bags of money from the scene, while the occupant exclaims: "And what about my grandmother's house? It's burning."

168.    At approximately timestamp 01:24:00, the Film ties those events to the earlier murder of Captain Jackie Velez, with officers accusing one another during transport of having "pulled the trigger" and having "finished her," and later reveals that certain law-enforcement personnel connected to the operation were involved in theft and in Captain Velez's murder.

169.    At approximately timestamp 01:31:00 the Film further depicts that, after the DEA agent responsible for the murder is confronted, he is shot and killed by Affleck at the scene rather than being taken into custody and arrested, while also including flashbacks to Captain Velez's

murder.

170. In that scene, Affleck is depicted as seeking revenge because the Film also depicted that Affleck and Captain Velez were involved in a romantic relationship.

171. The final shooting scene does not plainly or "obviously" indicate that Affleck was acting in self-defense; it can reasonably be understood as an execution-style, retaliatory killing.

172. Moreover, the Film does not end leaving the viewer with a positive impression of the Plaintiffs.

173. The Plaintiffs are portrayed throughout the Film as suspicious of one another, as concealing misconduct, as discussing whether to keep seized money, and as speaking directly with cartel members outside normal law-enforcement channels.

174. The Film further depicts officers accusing one another of theft and murder, reveals that law-enforcement personnel connected to the operation were involved in theft and in the murder of Captain Jackie Velez, and ends in an atmosphere of suspicion, accusation, and violence rather than honor or vindication.

175. Even if the Film ends with a so-called grand reveal, that reveal does not undo the numerous acts of misconduct that the Plaintiffs were portrayed as participating in throughout the Film.

176. The above-described statements and depictions from the Film made or caused to be made by Defendants were presented by Defendants as assertions of fact that, regarding Plaintiffs in their 2016 investigation and seizure of more than $20 million in concealed currency, contemplated theft, directed officers to violate protocol, concealed misconduct, communicated with cartel members, and committed other corrupt and criminal acts, and were made with actual malice.

25

177. The statements and depictions were directed and intended to portray the false narrative as a true story and thereby insinuate that Plaintiffs committed, participated in, condoned, or had a propensity to commit criminal acts during the course of their lawful investigation and police seizure.

178. The above-described defamatory statements and depictions by Defendants are materially false, were made concerning the Plaintiffs, were directed at Plaintiffs with actual malice, were published to a third party, and tend to subject Plaintiffs to hatred, distrust, ridicule, contempt, or disgrace because they accuse Plaintiffs of crimes and conduct incompatible with the proper exercise of their profession as law-enforcement officers.

179. Defendants each knew that their statements and depictions were false or acted in reckless disregard of the truth or falsity of the statements and depictions.

180. Alternatively, Defendants each purposely avoided further investigation with the intent to avoid the truth.

   a) Defendants relied on Officer Christopher Casiano as the source of the underlying story even though Casiano was not assigned to the Narcotics Bureau at the time of the seizure, did not execute the search warrant, and was not present for the recovery of the concealed currency and contraband.

   1. Defendants also engaged multiple law-enforcement consultants in connection with the development and production of the Film, including individuals identified in the Film's credits who were affiliated with or familiar with the Miami-Dade Police Department and the underlying investigation. Upon information and belief, such consultants possessed knowledge of the actual events and were capable of identifying the officers involved in the June 29, 2016 investigation.

Notwithstanding that access to knowledgeable sources, Defendants proceeded to market and distribute the Film as 'inspired by true events' while depicting fabricated criminal misconduct within the Miami-Dade Police Department Narcotics team."

181. Defendants knew or recklessly disregarded that the above-described statements and depictions were false and would be understood by the listening audience and viewers as factual assertions about Plaintiffs' conduct, integrity, and performance of their official duties.

182. The above-described statements and depictions by Defendants were not privileged and were published to audiences internationally.

183. As a direct and proximate result of the Defendants' above-described false, malicious, and defamatory statements and depictions, Plaintiffs have suffered, and continue to suffer, damages, including reputational harm, professional harm, emotional distress, lost income, diminished earning capacity, and loss of future opportunities.

184. Defendants each had actual knowledge of the wrongfulness of their above-described conduct and the high probability that injury or damage to Plaintiffs would result and, despite that knowledge, intentionally pursued that course of conduct with actual malice or reckless disregard for the truth, resulting in injury or damage to Plaintiffs, and thereby warranting imposition of punitive damages in addition to compensatory and consequential damages.

185. On or about December 23, 2025, Plaintiff, Sergeant Jason Smith, through counsel, sent Defendants a demand letter informing the Defendants as to the defamatory statements and depictions in *The Rip's* trailer release and other promotional material and demanding that the Film not be aired. Defendants disregarded this and published the Film.

186. Thereafter, on or about March 5, 2026, Plaintiffs, Sergeant Jason Smith and

Sergeant Jonathan Santana, through counsel, sent Defendants a detailed second formal demand for correction and/or retraction of the false portrayals contained in the Film. Defendants again failed to heed this notice and refused to correct and/or retract their statements and depictions.

WHEREFORE, by reason of the above and foregoing, Plaintiffs, JASON SMITH, and JONATHAN SANTANA, demand judgment against Defendants, FALCO PICTURES, LLC, and ARTISTS EQUITY, LLC, for compensatory damages, punitive damages as permitted by applicable law, attorneys' fees as permitted by law, costs, pre-judgment and post-judgment interest, and such further relief as the Court may deem just and proper.

## COUNT II
## DEFAMATION BY IMPLICATION

187.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 141 above, as if fully set forth herein.

188.    This is an action against Defendants for defamation by implication.

189.    At all times material hereto, Defendants were each aware that Plaintiffs had engaged in a lawful investigation and seizure on June 29, 2016, and that Plaintiff Sergeant Jason Smith supervised that investigation and Plaintiff Detective Jonathan Santana executed and participated in the investigative actions that led to the discovery of the concealed currency and contraband.

190.    Nevertheless, Defendants jointly and intentionally produced, published, distributed, marketed, and promoted *The Rip* as a film "inspired by true events," while using distinctive and verifiable details from that real investigation and portraying identifiable members of Plaintiffs' narcotics team as corrupt, criminal, and professionally unethical.

191.    *The Rip* was made of and concerning the Plaintiffs and their 2016 investigation and seizure and depicts Plaintiff Sergeant Jason Smith, portrayed by actor Matt Damon, and Detective

28

Jonathan Santana, portrayed by actor Ben Afflek.

192.   The facts of the 2016 investigation, to include Plaintiffs' involvement, formed the basis for the storyline of the Film.

193.   Although Plaintiffs are not named in the Film, *The Rip* as a whole contains sufficient facts or references from which the Plaintiffs may be determined by the persons watching or who have watched the Film.

194.   The Film replicates the roles that both Sergeant Jason Smith and Detective Jonathan Santana performed in the 2016 investigation and seizure.

195.   The average person could reasonably conclude that the Film implicates the Plaintiffs upon watching the Film.

196.   Moreover, those who know the Plaintiffs can make out that they are the persons referred to in the Film.

197.   Family members, colleagues, peers, and other third-parties, including a state attorney, have identified the Plaintiffs as those depicted in the Film and made comments regarding this to the Plaintiffs.

198.   Specifically, the Film replicates distinctive facts from the June 29, 2016 seizure, including:

1. The location of the "rip" being in Miami-Dade County;

2. The recovery of over $20 million by the Miami-Dade Police Department;

3. The presence of a cash sniffing dog alerting as to the presence of money;

4. The presence of an arched nook with a statue on the false wall;

5. Orange buckets concealed within a residential wall;

6. The physical breach of the drywall to expose those buckets;

7. Currency packaged in cellophane with marked denominations; and

8. Recovery of a loaded Tech 9 firearm at the scene located in one of the buckets.

199. In the Film, these real facts are juxtaposed alongside defamatory statements and depictions that indicate, in substance, that members of the Miami-Dade Police Department Narcotics team tied to the real June 29, 2016, seizure:

1. Contemplated and intended to steal seized drug proceeds for personal gain;

2. Performed police operations without involving the local jurisdiction and outside ordinary law-enforcement channels;

3. underreported the amount of money reported in a crime stopper tip and concealed the true amount from command;

4. collected phones, withheld information from superiors, and remained at the residence with the cash in furtherance of a theft scheme;

5. communicated directly with cartel members outside ordinary law-enforcement channels;

6. Constantly disregarded the chain of authority in the police department, including the structure within their own team;

7. participated in or were connected to arson in a residential neighborhood while removing money from the scene;

8. were involved in the murder of Captain Jackie Velez and in concealing wrongdoing within the team; and

9. shot and killed a Federal Agent instead of arresting him.

200. Defendants published the foregoing statements and depictions without any credible basis or proof that Plaintiffs had engaged in theft, underreporting of seized funds, concealment of

evidence, coordination with cartel members, arson, murder, or other criminal misconduct.

201.    Below are the particular scenes from the Film whereby Defendants caused to be made the above-described statements and depictions.

### *The Rip* Film Scenes

202.    At approximately timestamp 00:03:21, the Film depicts the Plaintiffs' narcotics team being questioned and scrutinized by federal agents who suspect that the killing of a former member of the team was tied to corruption within the team itself.

203.    At approximately timestamp 00:16:00, the Film depicts the members of the Plaintiffs' narcotics team drinking, smoking, and playing dominos directly outside of the Police Department.

204.    At approximately timestamp 00:16:10, the Film depicts the members of the Plaintiffs' narcotics team objecting to conducting an operation based on lack of overtime and stating that: "So they get to just fucking pay their bills, and we don't get to fucking pay our bills?".

205.     At approximately timestamp 00:16:40, the Film depicts the supervising officer lying to various members of the team as to the amount of the "Rip" and giving them inconsistent information.

206.    At approximately timestamp 00:17:00, the Film depicts supervising officer stating when asked whether local Hialeah police should be involved: "Absolutely not. That entire department's upside down."

207.    At approximately timestamp 00:18:30, the Film depicts the officers obtaining consent to enter a home through deception, lies, and coercion, including having a conversation in which one member asks the supervising officer, "All right, what do we tell 'em?" to which the supervising officer responds: "A lie."

208. At approximately timestamp 00:30:20, the Film depicts the supervising officer refusing to notify his superior as to the full amount of money discovered at the house.

209. At approximately timestamp 00:32:30, the Film depicts the officers questioning the integrity of the Hialeah Police Department.

210. At approximately timestamp 00:45:00, the Film depicts the officers asking hypothetically whether the cartel would loan them part of the seized money.

211. At approximately timestamp 00:49:00, the Film depicts the supervising officer addressing the other officers directly and stating: "But just between us… I think we can make something happen here. All right? I know we're all thinking it, so let's get realistic right now. But I wanna get mine, and I know you wanna get yours. All right? I wanna get paid."

212. At approximately timestamp 01:03:00, the Film also depicts the officers speaking directly with cartel members and disclaims any possibility that the cartel had any involvement with the police killing.

213. At approximately timestamp 01:05:30, the Film depicts the members of the team arguing over who is in charge and what was to be done with the cash, with one officer questioning the supervising officer's intentions and stating, "So that's it? You're gonna burn us, boss? That's it? You're just gonna take the fucking money?"

214. At approximately timestamp 01:11:00, the Film further depicts the residence catching fire while officers continue attempting to remove bags of money from the scene, while the occupant exclaims: "And what about my grandmother's house? It's burning."

215. At approximately timestamp 01:24:00, the Film ties those events to the earlier murder of Captain Jackie Velez, with officers accusing one another during transport of having "pulled the trigger" and having "finished her," and later reveals that certain law-enforcement

personnel connected to the operation were involved in theft and in Captain Velez's murder.

216. At approximately timestamp 01:31:00 the Film further depicts that, after the DEA agent responsible for the murder is confronted, he is shot and killed by Affleck at the scene rather than being taken into custody and arrested, while also including flashbacks to Captain Velez's murder.

217. In that scene, Affleck is depicted as seeking revenge because the Film also depicted that Affleck and Captain Velez were involved in a romantic relationship.

218. The final shooting scene does not plainly or "obviously" indicate that Affleck was acting in self-defense; it can reasonably be understood as an execution-style, retaliatory killing.

219. Moreover, the Film does not end leaving the viewer with a positive impression of the Plaintiffs.

220. The Plaintiffs are portrayed throughout the Film as suspicious of one another, as concealing misconduct, as discussing whether to keep seized money, and as speaking directly with cartel members outside normal law-enforcement channels.

221. The Film further depicts officers accusing one another of theft and murder, reveals that law-enforcement personnel connected to the operation were involved in theft and in the murder of Captain Jackie Velez, and ends in an atmosphere of suspicion, accusation, and violence rather than honor or vindication.

222. Even if the Film ends with a so-called grand reveal, that reveal does not undo the numerous acts of misconduct that the Plaintiffs were portrayed as participating in throughout the Film.

223. The above-described statements and depictions from the Film made or caused to be made by Defendants falsely and maliciously imply that, Plaintiffs during their 2016 investigation,

and seizure of more than $20 million in concealed currency, contemplated theft, directed officers to violate protocol, concealed misconduct, communicated with cartel members, and committed other corrupt and criminal acts, and were made with actual malice.

224.    These statements and depictions were directed and intended to portray the false narrative as a true story because the false narrative was more sensational than the truth surrounding the real operation, and thereby imply that Plaintiffs committed, participated in, condoned, or had a propensity to commit criminal acts during the course of their lawful investigation and police seizure.

225.    Moreover, the above-described statements and depictions were juxtaposed alongside true facts from the June 29, 2016 seizure so as to imply and create the false impression that members of the team would consider committing criminal acts or create an inference that one of the members had already committed a criminal act during the course of the lawful investigation and police seizure.

226.    The above-described statements and depictions also create a defamatory implication that members of the team would consider committing criminal acts or create an inference that one of the members had already committed a criminal act by omitting facts from the real lawful investigation.

227.    The above-described defamatory statements and depictions by Defendants are materially false, were made concerning the Plaintiffs, were directed at Plaintiffs with actual malice, were published to a third party, and tend to subject Plaintiffs to hatred, distrust, ridicule, contempt, or disgrace because they accuse Plaintiffs of crimes and conduct incompatible with the proper exercise of their profession as law-enforcement officers.

228.    Defendants each knew that their statements and depictions were false or acted in

34

reckless disregard of the truth or falsity of the statements and depictions.

229. Alternatively, Defendants each purposely avoided further investigation with the intent to avoid the truth.

1. Defendants relied on Capt. Christopher Casiano as the source of the underlying story even though Capt. Christopher Casiano was not assigned to the Narcotics Bureau at the time of the seizure, did not execute the search warrant, and was not present for the recovery of the concealed currency and contraband.

2. Defendants also engaged multiple law-enforcement consultants in connection with the development and production of the Film, including individuals identified in the Film's credits who were affiliated with or familiar with the Miami-Dade Police Department and the underlying investigation. Upon information and belief, such consultants possessed knowledge of the actual events and were capable of identifying the officers involved in the June 29, 2016 investigation. Notwithstanding that access to knowledgeable sources, Defendants proceeded to market and distribute the Film as 'inspired by true events' while depicting fabricated criminal misconduct within the Miami-Dade Police Department Narcotics team."

230. Defendants knew or recklessly disregarded that the above-described implications were false and would be understood by the listening audience and viewers as factual assertions about Plaintiffs' conduct, integrity, and performance of their official duties.

231. The above-described statements and depictions by Defendants were not privileged and were published to audiences internationally.

232. As a direct and proximate result of the Defendants' above-described false,

35

malicious, and defamatory statements and depictions, Plaintiffs have suffered, and continue to suffer, damages, including reputational harm, professional harm, emotional distress, lost income, diminished earning capacity, and loss of future opportunities.

233.    Defendants each had actual knowledge of the wrongfulness of their above-described conduct and the high probability that injury or damage to Plaintiffs would result and, despite that knowledge, intentionally pursued that course of conduct with actual malice or reckless disregard for the truth, resulting in injury or damage to Plaintiffs, and thereby warranting imposition of punitive damages in addition to compensatory and consequential damages.

234.    On or about December 23, 2025, Plaintiff, Sergeant Jason Smith, through counsel, sent Defendants a demand letter informing the Defendants as to the defamatory statements and depictions in *The Rip's* trailer release and other promotional material and demanding that the Film not be aired. Defendants disregarded this and published the Film.

235.    Thereafter, on or about March 5, 2026, Plaintiffs, Sergeant Jason Smith and Sergeant Jonathan Santana, through counsel, sent Defendants a detailed second formal demand for correction and/or retraction of the false portrayals contained in the Film. Defendants again failed to heed this notice and refused to correct and/or retract their statements and depictions.

WHEREFORE, by reason of the above and foregoing, Plaintiffs, JASON SMITH, and JONATHAN SANTANA, demand judgment against Defendants, FALCO PICTURES, LLC, and ARTISTS EQUITY, LLC, for compensatory damages, punitive damages as permitted by applicable law, attorneys' fees as permitted by applicable law, costs, pre-judgment and post-judgment interest, and such further relief as the Court may deem just and proper.

## COUNT III
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
## (IN THE ALTERNATIVE)

236.     Plaintiffs reallege and incorporate by reference paragraphs 1 through 141 above, as if fully set forth herein.

237.     This count is pled in the alternative to Counts I and II.

238.     Defendants' publication and dissemination of the above-described Film regarding Plaintiffs was so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and be regarded as odious and utterly intolerable in a civilized society.

239.     Defendants' conduct extended beyond the mere publication of a motion picture. Following the release of the Film and its promotional materials, Plaintiffs were subjected to repeated accusations of criminal conduct, including inquiries from individuals in official law-enforcement capacities questioning whether Plaintiffs had engaged in theft or homicide. Plaintiffs were further confronted by members of the public and professional community who believed Plaintiffs had committed the acts depicted in the Film.

240.     Plaintiffs had notified Defendants as to the falsity of the Film's statements and depictions and the harm being caused to Plaintiffs. Despite that notice, Defendants recklessly disregarded Plaintiffs' demands and continued to publish, distribute, and promote the Film without correction or retraction.

241.     Defendants, moreover, included identifying material within the Film and replicated distinctive and verifiable details of the real investigation in a manner that caused members of the community, including individuals within law enforcement, to identify Plaintiffs as the officers portrayed in the Film.

242.     As a direct and proximate result of Defendants' conduct, Plaintiffs suffered severe emotional distress manifested by repeated public accusations of criminal conduct, damage to their professional credibility within law-enforcement circles, and ongoing stress associated with

defending their reputations against allegations of corruption and violence, including accusations that Plaintiffs were involved in the murder of a fellow officer.

243.    This emotional distress is ongoing and is exacerbated each time the Film is viewed, promoted, or discussed, and is further compounded by Plaintiffs' inability to control or correct the false narrative presented to the public.

244.    Defendants had actual knowledge of the wrongfulness of their conduct and the high probability that injury or damage to Plaintiffs would result and, despite that knowledge, intentionally pursued that course of conduct, thereby warranting imposition of punitive damages.

WHEREFORE, by reason of the above and foregoing, Plaintiffs, JASON SMITH, and JONATHAN SANTANA, demand judgment against Defendants, FALCO PICTURES, LLC, and ARTISTS EQUITY, LLC, for compensatory damages, punitive damages as permitted by applicable law, attorneys' fees as permitted by law, costs, pre-judgment and post-judgment interest, and such further relief as the Court may deem just and proper.

## PUNITIVE DAMAGES

Plaintiff reserves the right to amend this Complaint to seek punitive damages against the Defendants in accordance with Section 768.72, Fla. Stat.

## DEMAND FOR JURY TRIAL

Plaintiffs demand trial by jury on all issues so triable.

Date: May 6, 2026

Respectfully Submitted,

/s/ Ignacio M. Alvarez
Ignacio M. Alvarez
Imalvarez@algofirm.com
Gavin Sinclair
gsinclair@algofirm.com

38

ALGO Law Firm, LLP
815 Ponce De Leon Blvd., Suite 101
Coral Gables, Florida 33132
T: (305) 723-1876

**<u>VERIFICATION</u>**

Pursuant to Section 92.525(2), Florida Statutes, under penalties of perjury, we declare that we have read the foregoing Verified Complaint for Damages and that the facts stated in it are true and correct to the best of our knowledge, information, and belief.

Executed on this _____ day of May 2026.

_____
JASON SMITH

_____
JONATHAN SANTANA